**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **American National Insurance Company,** | ) | |
| **a Texas Insurance Company,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 11-cv-4016** |
| **v.** | ) | |
| | ) | **Judge John Z. Lee** |
| **American National Investment Advisors,** | ) | |
| **LLC, an Illinois Limited Liability Company,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

In October 2009, Defendant American National Investment Advisors, LLC ("ANIA") began offering investment advisory and financial planning services to clients in the Chicago area under the name "American National." By that time, however, Plaintiff American National Insurance Company ("ANICO"), an insurance company based in Texas, had already registered the trademark "American National," and related permutations of "American National," for use in connection with the various insurance and financial services it offered. ANICO requested that ANIA cease from using "American National" in connection with its business. When ANIA refused, ANICO commenced this lawsuit, asserting claims for trademark infringement and false designation of origin pursuant to the Lanham Act, 15 U.S.C. §§ 1114, 1125(a); trademark infringement and unfair competition under Illinois common law; violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1; and violations of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1.

Having considered the evidence presented during the three-day bench trial as well as the numerous post-trial submissions, the Court finds that Defendant ANIA's use of "American

National" infringes upon Plaintiff ANICO's "American National" mark as set forth in Registration No. 1,837,021. As discussed below, the Court finds no sufficiently compelling evidence to invalidate this registration. Furthermore, the similarity of ANIA's mark to ANICO's '021 mark, coupled with the similarity of goods and services sold under the parties' respective marks, creates a likelihood of consumer confusion sufficient to support findings of infringement and false designation of origin under the Lanham Act. Having satisfied the Lanham Act test, ANICO also succeeds on its Illinois statutory and common law claims for trademark infringement, unfair competition, and deceptive trade practices. Accordingly, the Court enters judgment in favor of ANICO and against ANIA as to Counts I through V of the Complaint with respect to the mark "American National" as set forth in Registration No. 1,837,021. As for ANICO's other federally registered trademarks, the Court finds that ANICO has failed to prove by a preponderance of the evidence that a likelihood of confusion exists with respect to these marks and enters judgment in favor of ANIA in this regard.

## I. <u>Procedural History</u>

On June 13, 2011, ANICO filed a complaint against ANIA, which asserted five causes of action:

    I.     Federal trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114, for using a counterfeit or colorable imitation of ANICO's federally registered "American National" marks;

    II.     Federal unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. 1125(a), for creating a false designation of origin or misleading representations by using the mark "American National";

    III.     State common law trademark infringement, for using ANICO's existing "American National" marks in a way likely to cause confusion, mistake or deception to the public;

IV.    State statutory and common law unfair competition claims pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 505/1-12 and 815 Ill. Comp. Stat. 510/1-7 respectively, and Illinois common law, for creating a likelihood of confusion, mistake, or deception with the public as the origin of ANIA's goods and services; and

V.     State statutory trademark dilution in violation of the Illinois Anti-Dilution Act, 765 Ill. Comp. Stat. 1035/15, for diluting the distinctiveness and identifiability of ANICO's "American National" marks.

Dkt. 1 (Compl.) at 4-7. The complaint sought recovery of lost profits, treble damages, attorney's fees, and an injunction regarding ANIA's alleged unauthorized use of the name "American National." *Id.* at 8-9.

On July 12, 2011, ANIA filed its answer to the complaint and raised five affirmative defenses, asserting that: (1) the mark "American National" was merely descriptive, mis-descriptive, geographically descriptive, or otherwise lacking in distinctiveness; (2) the complaint failed to state a claim upon which relief could be granted; (3) the claims were barred by the doctrines of laches and estoppel; (4) ANICO abandoned its '021 mark; and (5) ANICO perpetrated a fraud on the USPTO when registering the '021 mark. Dkt. 10 (Ans.) at 9-13.

On July 5, 2012, ANIA asked the Court to stay these proceedings pending the outcome of the USPTO's cancellation proceeding for one of the registered marks at issue.[1] Dkt. 43. In that proceeding, ANIA had petitioned the USPTO's Trademark Trial and Appeal Board ("TTAB") to cancel the mark. *Id.* at 4. This motion was denied.[2] Dkt. 46.

ANICO subsequently moved for summary judgment on ANIA's first, third, fourth, and fifth affirmative defenses. Dkt. 72. The Court granted summary judgment in favor of ANICO as

---

[1]    Another mark initially raised in this litigation was surrendered by ANICO for cancellation because of "incorrect disclaimer."

[2]    Ultimately, the TTAB cancellation proceeding and a related trademark application by ANICO were themselves stayed pending the outcome of this litigation.

to the first affirmative defense, holding that ANICO's '021 mark is incontestable. ANIA's third affirmative defense was withdrawn, and the remainder of the motion was denied. Dkt. 97.

The Court then conducted a three-day bench trial on ANICO's claims and ANIA's remaining affirmative defenses. In its post-trial brief, ANICO withdrew the claim of state trademark dilution asserted in Count V of its complaint, which was based upon an Illinois statute that had been repealed in 1998. Dkt. 103 (Pl.'s Post-Trial Br.) at 2.

## II.    Standard of Decision

Where an action is "tried on the facts without a jury," Fed. R. Civ. P. 52 requires the district court to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a); *see Khan v. Fatima,* 680 F.3d 781, 785 (7th Cir. 2012). "The district court must 'explain the grounds' of its decision and otherwise demonstrate a 'reasoned, articulate adjudication.'" *Susan Patterson Interiors, Inc., v. Tobias*, No. 11-C-221, 2012 WL 4578694, at *3 (N.D. Ill. Oct. 1, 2012) (quoting *Aprin v. U.S.,* 521 F.3d 769, 776 (7th Cir. 2008)).

In rendering its decision in this case, the Court has considered the admissible testimony and documentary evidence offered at trial. In so doing, the Court has considered the weight to be given to the evidence and has assessed the credibility of the witnesses in light of their demeanor, their ability to see, hear, and know the matters about which they testified, and any potential for bias. Furthermore, the Court has considered the memoranda submitted by the parties after the trial and the legal and factual arguments set forth therein.

## III.    The Trial

During the trial, ANICO presented evidence of the validity of its trademarks and the likelihood of confusion caused by ANIA's use of the name "American National."   ANIA

disputed the validity of ANICO's '021 registration on the grounds of abandonment and fraud, and further argued against a likelihood of confusion caused by ANIA's use of its mark.

### A. Fact Witnesses

ANICO called Deborah Janson, Dwain Akins, and Max Davenport as fact witnesses. Ms. Janson is vice president of corporate planning at ANICO and provided testimony regarding ANICO's financial products, entity structure and operations, and market strength. Mr. Akins is a senior vice president of corporate relations and chief compliance officer at ANICO. He attested to ANICO's financial products, entity structure, and operations. Mr. Davenport, a multiple line general agent at ANICO, testified regarding ANICO's financial products and the activities of ANICO's agents.

For its part, ANIA presented Peter C. Claeys. Mr. Claeys is the founder and president of ANIA, and testified regarding ANIA's financial services and operations.

### B. Expert Witnesses

ANICO presented Timothy C. Pfeifer as an expert witness. Mr. Pfeifer is an actuarial consultant in the area of insurance and investment products. He opined as to the likelihood of consumer confusion caused by use of the "American National" mark.

ANIA called Thomas J. Maronick as an expert witness. Dr. Maronick is a professor of marketing at Towson University and a former director of impact evaluation in the Bureau of Consumer Protection at the Federal Trade Commission. He testified regarding the results of a consumer survey that he performed to evaluate the likelihood of consumer confusion caused by ANIA's use of the name "American National."

On rebuttal, ANICO tendered Gabriel M. Gelb, a professional market researcher, as an expert witness. Mr. Gelb testified regarding survey research generally and Dr. Maronick's survey in particular.

Based upon the evidence admitted at trial and the post-trial submissions of the parties, the Court enters the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).[3]

## IV.  Factual Background

### A.  ANICO

ANICO is an insurance company founded in 1905 and headquartered in Galveston, Texas. Dkt. 92 (Stipulations) at 12. It creates insurance and financial products and provides other financial services tied to its core insurance business. *Id.* Over the years, ANICO has expanded its offerings to include a wider array of other financial and investment-related products, including variable annuities and other variable products, in-house funds bundled into its products, retail mutual funds, securities brokerage, and investment and financial consulting services. *Id.* at 12-13.

ANICO has offered these products through a somewhat complicated network of subsidiaries, licensees, and agents. According to Mr. Akins of ANICO, the United States Securities and Exchange Commission ("SEC") and applicable state regulations generally dictate that a company must segregate its insurance-related assets from its customer securities. Dkt. 106 (Trial Testimony, hereinafter, "Tr.") at 170:20-171:13; *see generally* 17 C.F.R. § 240.15c3–3 (requiring segregation of customer securities); 215 Ill. Comp. Stat. 5/274 (requiring segregation of insurance accounts). In addition, ANICO, while registered to provide insurance products, does

---

[3]       To the extent that any finding of fact may be considered a conclusion of law, it shall also be deemed a conclusion of law; similarly, to the extent that any conclusion of law may be considered a finding of fact, it shall also be deemed a finding of fact.

not directly broker securities such as mutual funds or variable products to the public. Instead, it does so through its subsidiaries and agents. Dkt. 106, Tr. at 146:16-147:4, 178:20-24.

**B.      ANICO's Subsidiaries SM&R and ANRIA**

ANICO's family of insurance and financial products have generally been offered under the "American National" mark, although the subsidiaries that manage and sell the products have not always taken the "American National" brand as a company name. Specifically, from 1967 to 2010, ANICO operated a wholly-owned subsidiary called Securities Management and Research, Inc. ("SM&R"). *Id.* at 155:14-25, 166:11-167:5, 168:15-17. SM&R was the principal underwriter, broker-dealer, and investment advisor for ANICO's retail mutual fund and general investment advisory business. *Id.* SM&R also supervised a subset of ANICO's agents who were licensed with the SEC to sell securities and were referred to as "SM&R registered representatives." Dkt. 92 at 10. The services offered or supervised by SM&R were presented, promoted, and marketed under the "American National" brand. *See*, *e.g.*, Pl.'s Exhs. 91-93, 105, 108, 110, 118, 193, 194, 234-250, 252, 256-261, 269-272, 290, 292-293, 298-302, 314, 362.

From 1968 to the present, ANICO has also retained "multiple-line" insurance agents, some of whom are "registered representatives" with the SEC. Dkt. 107, Tr. at 274:14-275:7. Again, as Mr. Akins testified, registered representatives may sell securities, including retail mutual funds and variable products, to the public by virtue of their individual licenses even when ANICO itself cannot do so directly. *Id.*; Dkt. 106, Tr. at 178:20-24. These agents are referred to as "American National agents" in publicly-available advertising and use "American National" branding on their promotional materials and other items. *See*, *e.g.*, Pl.'s Exhs. 91-93, 234-250, 252, 290, 292-293, 298-302, 314, 362. However, as registered representatives directly selling securities to the public, these agents were supervised by SM&R, as noted above. Dkt. 106, Tr. at

174:16-175:14; Pl.'s Ex. 300. ANICO's agents, who are registered representatives, continue to sell retail mutual funds and variable products today. Dkt. 105, Tr. at 35:4-5.

During approximately the same period of time, from 1968 to 1993, ANICO licensed the "American National" mark to its subsidiary for use on its retail mutual funds, including American National Growth Fund, Inc., and American National Income Fund, Inc. Dkt. 106, Tr. at 172:23-173:4; Pl.'s Exh. 226. These funds were wholly managed by SM&R and were offered for sale to the public by American National agents, who also served as SM&R registered representatives. Dkt. 106, Tr. at 168:2-17; Dkt. 107, Tr. at 274:23-276:19.

From 1988 to 2010, ANICO managed another wholly-owned subsidiary, American National Investment Accounts, Inc., which created numerous other "American National" branded portfolios to be bundled into ANICO's variable products. Dkt. 106, Tr. at 169:12-25, 190:20-25. Examples include the American National Growth Portfolio and the American National Balanced Portfolio. *Id.* at 185:7-23; Pl.'s Exhs. 193-94.

In 2010, ANICO sold SM&R and subsequently transferred its registered investment advisory business to a new subsidiary, American National Registered Investment Advisors, Inc. ("ANRIA"). Dkt. 92 (Stipulations) at 13. This new subsidiary fulfills a similar role as SM&R, incorporating broker-dealer, underwriting, and investment advisory services under the "American National" brand name. *Id.*

### C. ANICO's Federal Trademark Registrations

Over more than a century of operations, ANICO has accumulated a number of trademarks pertaining to the "American National" brand. ANICO asserts ownership of the following federal service mark registrations: Reg. No. 1,207,499 for the word mark "American National Insurance Company" covering "underwriting life and health insurance" ("Reg. '499");

Reg. No. 1,207,500 for the word mark "American National Life Insurance Company of Texas" also covering "underwriting life and health insurance" ("Reg. '500"); Reg. No. 1,308,303 for the word mark "American National" covering "property and casualty insurance underwriting services" ("Reg. '303"); Reg. No. 1,837,021 for the word mark "American National" covering "mutual fund investment services" ("Reg. '021"); and Reg. No. 3,217,075 for the word and logo mark "American National Designed Benefits: The Financial Building System" covering "insurance consultation, investment consultation, financial analysis and consultation, and financial planning for employees, and employee groups; mutual fund and securities brokerage, distribution, and investment, and insurance underwriting services for all types of insurance" ("Reg. '075").[4]

That ANICO owns these federal service mark registrations, as well as the chronology of ANICO's registration processes, is undisputed. Dkt. 92 (Stipulations) at 12-13. Of ANICO's registrations at issue in this case, Reg. '021 for "mutual fund investment services" alone applies the plain word mark "American National" to financial and investment services outside of the insurance product context. *See* AMERICAN NATIONAL, Registration No. 1,837,021. Reg. '021 was registered on May 17, 1994, and became incontestable on July 19, 2000. *Id.* Not surprisingly, the parties have focused almost exclusively on this mark during the course of the trial.

### D. ANICO's '021 Registration

At the time of Reg. '021's initial filing on June 5, 1992, ANICO's attorney Margaret Boulware submitted with the application an affidavit signed the day before by ANICO's

---

[4] ANICO's complaint also asserted Registration No. 1,243,114, but this mark is not discussed in ANICO's Proposed Findings of Fact and Conclusions of Law or its post-trial brief. Furthermore, an additional trademark application for brokerage, underwriting, and investment advisory services by American National Registered Investment Advisor, Inc. is currently on hold, pending the outcome of this litigation.

president, Orson C. Clay. *Id.* at 13. The Clay affidavit included as a specimen of use a prospectus and application for the American National Growth Fund, Inc., which was a retail mutual fund controlled and licensed by ANICO and using the "American National" mark. *Id.* The prospectus disclosed that investment in the fund was available through ANICO's wholly-owned subsidiary SM&R, which did *not* use the "American National" mark. Dkt. 106, Tr. at 221:6-21. After the USPTO initially rejected the application for lack of distinctiveness, ANICO submitted a separate affidavit from February 25, 1992, also executed by Clay, attesting that the mark had become distinctive for mutual fund investment services due to ANICO's "substantially exclusive and continuous use [of the mark] in commerce" for at least five years prior to the date of that affidavit. Pl.'s Exh. 226.

Then, on May 2, 2000, ANICO's executive vice president Michael W. McCroskey executed an affidavit attesting to the continuous use of the mark in commerce. *Id.* As a specimen of use, ANICO included a prospectus from American National Investment Accounts, Inc., another wholly-owned subsidiary that created "American National" branded funds for bundling in ANICO's variable products. *Id.*; Pl.'s Exh. 276. This prospectus also contained a disclaimer that direct investment in the branded funds was not possible and that investors could only purchase shares as part of ANICO's insurance or annuity contracts. Pl's Exh. 193.

Finally, on May 10, 2004, ANICO submitted an additional affidavit in support of trademark renewal, signed by ANICO's senior executive vice president Ronald J. Welch. Pl.'s Exh. 277. Included in this affidavit was a screenshot of ANICO's webpage showing "mutual funds" as one of the financial products provided by ANICO or its subsidiaries. *Id.*

### E.     ANIA

In October 2009, ANIA, an Illinois LLC, commenced operations offering investment advisory and financial planning services to the public. Dkt. 92 (Stipulations) at 14. As part of these services, ANIA has offered brokerage and consultation for securities, including mutual funds and variable products. Dkt. 107, Tr. at 310:17-25. ANIA's business was presented to the public under the "American National Investment Advisors" or "American National" name in all respects, including promotion and advertising, and in the course of providing services. *Id.* at 341:21-343:14; Pl.'s Exh. 286.

On March 24, 2010, ANIA filed a federal trademark application, Serial No. 77/967,038 for the word mark "American National" covering "financial and investment services, namely, management and brokerage in the fields of stocks, bonds, options, commodities, futures and other securities, and the investment of funds of others." *See* U.S. Trademark Application Serial No. 77/967,038 (filed Mar. 24, 2010). The USPTO denied registration due to the likelihood of confusion with Reg. '021 and because it concluded that the mark was merely descriptive and lacked distinctiveness. ANIA abandoned its trademark application on July 28, 2011. Pl.'s Exh. 287.

On April 19, 2011, ANIA received a cease-and-desist letter from ANICO, which marked the first contact between the parties. Dkt. 92 (Stipulations) at 13. ANIA's founder and president, Peter C. Claeys, testified that he had no knowledge of ANICO until this first contact. Dkt. 107, Tr. at 332:1-5, 352:12-17. ANIA filed a cancellation proceeding for ANICO's Reg. '021 on June 14, 2012, and continues to use the "American National" mark. Dkt. 92 (Stipulations) at 14.

## V.    Analysis of the Claims

### A.    Federal Lanham Act Claims

The Lanham Act of 1946 protects registered and unregistered marks used in commerce.

A defendant is liable for trademark infringement under the Lanham Act if the defendant:

> [W]ithout the consent of the registrant- (a) use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[.]

15 U.S.C. § 1114(1)(a). Federal trademark infringement claims brought under § 1114 are limited to federally registered marks.

The Lanham Act also protects against unfair competition by:

> [a]ny person who, on or in connection with any goods or services [. . .] uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which- (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]

15 U.S.C. § 1125(a)(1). Claims asserting false designation of origin brought under § 1125 do not require the mark to be federally registered.

Regardless of registration status, claims for trademark infringement under 15 U.S.C. § 1114(1) and for false designation of origin under 15 U.S.C. § 1125(a) require a plaintiff to prove two elements by a "preponderance of the evidence." *Knaack Mfg. Co. v. Rally Accessories, Inc.*, 955 F. Supp. 991, 999 (N.D. Ill. 1997).  First, the plaintiff must demonstrate that its mark is protected under the Lanham Act. *See Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008); *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673-74 (7th Cir. 2001); *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 897 (7th Cir. 2001); *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d

1041, 1043 (7th Cir. 2000); *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000). Second, the plaintiff must show that the defendant's use of the mark is likely to cause consumer confusion. *See id.*

### 1.      Protectible Trademark

A plaintiff asserting a Lanham Act claim must first establish "that it has a protectible trademark." *Ty, Inc.*, 237 F.3d 891 at 897 (internal citations and quotation marks omitted). Federal registration of a trademark on the USPTO's principal register

> shall be *prima facie* evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right use the registered mark in commerce on or in connection with the goods or services specified in the registration[.]

15 U.S.C. § 1115(a). Registration of a trademark therefore "creates a rebuttable presumption that the mark is valid. . . ." *Georgia-Pac. Consumer Prods. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727 (7th Cir. 2011). Furthermore, a registered mark becomes incontestable after "continuous use for five consecutive years subsequent to the date of such registration" provided the mark is still in use in commerce. 15 U.S.C. § 1065. Registration of an incontestable mark "shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." *Id.*

All of the registered marks at issue in this case, save one (Reg. '075 covering the word and logo mark "American National Designed Benefits: The Financial Building System"), have become incontestable under 15 U.S.C. § 1065. This includes the mark that forms the foundation of ANICO's claims, Reg. '021, which has been incontestable since 2000. Even an incontestable mark, however, is subject to the affirmative defenses that "the registration or the incontestable right to use the mark was obtained fraudulently" or that "the mark has been abandoned by the

registrant." 15 U.S.C. § 1115(b)(1)-(2). ANIA raises both arguments as affirmative defenses as to Reg. '021. The validity of ANICO's other registered marks is undisputed.

### a. Abandonment

As an affirmative defense, ANIA contends that ANICO has abandoned its '021 mark. In both federal and common law, the holder of an abandoned mark relinquishes all rights to the exclusive use and ownership of the mark where abandonment is found. *See* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 17:2 (4th ed. 2013). Under the Lanham Act, a mark shall be deemed abandoned if:

> [i]ts use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be *prima facie* evidence of abandonment. "Use" of a mark means the *bona fide* use of such mark made in the ordinary course of trade, and not made merely to reserve right in a mark.

15 U.S.C. § 1127. A *bona fide* use of a mark in the ordinary course of trade, or "use in commerce," occurs:

> [o]n services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

*Id.*

Abandonment thus depends on two key elements: lack of use, and intent not to resume use. *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 955 (7th Cir. 1992). However, because abandonment "results in a forfeiture of rights, the courts are reluctant to find an abandonment." 3 McCarthy, *supra*, § 17:12. As such, even if a statutory presumption of abandonment is created after three years of non-use, that presumption may be rebutted by "'evidence explaining the nonuse or demonstrating the lack of an intent not to resume use.'" *Sands*, 978 F.2d at 955 (quoting *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 938 (7th Cir. 1989)).

What is more, "[p]roof of the statutory period of nonuse sufficient to trigger the presumption must also be clear," and federal courts are in agreement that a *prima facie* showing of abandonment shifts the burden of *production* to the mark holder, but leaves the burden of *persuasion* and ultimate burden of proof on the challenging party. 3 McCarthy, *supra*, § 17:21; *see Rivard v. Linville*, 133 F.3d 1446, 1449 (Fed. Cir. 1998); *Roulo*, 886 F.2d at 938; *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021, 1026 (Fed. Cir. 1989).

ANIA's first burden as to the issue of abandonment, then, is to show ANICO's lack of use of the '021 mark. The grounds for abandonment presented to the Court are somewhat unusual in that they deal less with ANICO's actual use of the mark, and more with the boundaries of the services specification set forth in the trademark registration. Along these lines, ANIA does not dispute that ANICO engaged in various licensing and other financial and financial services activities using the "American National" brand and involving mutual funds in some fashion. Rather, ANIA offers two other arguments. First, it contends that, because ANICO's primary business of insurance and variable products cannot be classified as dealing in mutual funds, ANICO has not engaged in "mutual fund investment services" as specified in the trademark registration and therefore has abandoned the mark. Next, ANIA asserts that ANICO's other activities, such as SM&R's management of its own retail mutual funds and its agents' sale of retail mutual funds under SM&R's supervision, do not satisfy the "*bona fide* use of the mark" requirement, because all of the actual distribution and investment activities were done in the name of a different company. Each argument will be addressed in turn.

The Court first considers whether ANICO's investment services can be characterized as "mutual fund investment services." ANICO is registered with the SEC to issue variable products such as annuities and life insurance products, though its assets in this area are segregated in

separate accounts from its insurance assets. Dkt. 106, Tr. at 170:20-171:13. ANICO itself does not broker these products to the public directly. Many of these variable products consist of collections of funds or portfolios bundled together and structured as annuities. Each fund or portfolio in an annuity bundle is generally referred to as a "sub-account." Dkt. 107, Tr. at 301:1-6. An investor may select from available sub-account investment options and directly choose the underlying funds in which to invest. Dkt. 106, Tr. at 169:15-20, 184:1-5. Between 1988 and 2010, a wholly-owned ANICO subsidiary, American National Investment Accounts, Inc., created numerous funds for use in association with ANICO's variable products. In addition to its own available investment portfolios, ANICO provided sub-account options from a variety of other large investment firms and mutual fund managers. Dkt. 106, Tr. at 197:8-14.

For its part, ANIA correctly points out that retail mutual funds and variable products are handled differently throughout the brokerage and investment process.[5] ANICO's own fact witness, Akins, testified that investors in variable products "can't invest in a retail fund" directly. Dkt. 106, Tr. at 170:9-18. Davenport also acknowledged that funds in a variable product must be called sub-accounts and may not be called mutual funds, even if their composition is indistinguishable. Dkt. 107, Tr. at 275:8-15, 301:1-24. As such, the 2001 prospectus for American National Investment Accounts, Inc. referred to each portfolio as a separate mutual fund "in effect." Pl.'s Exh. 193. In addition to differences in classification and structure, ANIA highlights the differences in broker and manager compensation: public fund managers are paid based on asset value, while variable products brokers are paid commission per contract sold.

Despite these differences, however, it is uncontested that sub-accounts, which consist of mutual funds, are functionally identical to mutual funds themselves. In fact, the SEC as well as

---

[5]     Mutual funds and variable product sub-accounts are generally treated as distinguishable securities. *See*, *e.g.*, *Final Rule: Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings*, S.E.C. Release No. 8408, 2004 WL 865790, at *8 (Apr. 16, 2004).

other courts have described variable product sub-accounts as being tied to "underlying mutual funds." *See*, *e.g.*, *Final Rule: Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings*, S.E.C. Release No. 8408, 2004 WL 865790, at *8 (Apr. 16, 2004) (notes that sub-accounts each "invest[] in a different underlying mutual fund"); *Miller v. Nationwide Life Ins. Co.*, 448 F. App'x 423, 427 (5th Cir. 2011) (notes that "each of the subaccounts corresponds with an underlying mutual fund"). Additionally, over the years, some (and now all) sub-accounts in ANICO's variable products are managed by retail mutual fund providers. Based upon the particular facts before it, the Court finds that ANICO's provision of variable products and services, where those products consist of and are functionally identical to mutual funds, falls within "mutual fund investment services" for the purposes of the '021 registration.

Turning to ANIA's second argument challenging *bona fide* use, ANIA is correct that ANICO is not licensed to sell retail mutual funds directly. However, between 1967 and 2010, ANICO managed a wholly owned subsidiary, SM&R, which was a registered broker-dealer and investment advisor, as well as the principal underwriter for ANICO's funds. The corporate structure was such that ANICO itself was not registered to deal in mutual funds, broker other securities, or dispense investment advice; rather, it relied upon SM&R to perform these functions. Moreover, a subset of ANICO's agents were also registered representatives and sold securities, including retail mutual funds, to the public by virtue of their individual licenses even when ANICO itself could not do so directly. These registered representatives were supervised by SM&R as required by SEC regulation, but presented themselves as American National agents when advertising and providing services. Notwithstanding this, ANIA asserts that these activities do not satisfy the *bona fide* use requirement, because the distribution and all the actual investment advisory activities were done in the name of a different company.

Under the Lanham Act, use requires "an open and notorious public offering of the services to those for whom the services are intended." *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1358 (Fed. Cir. 2009) (quotation omitted). Additionally, "[w]here a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or its registration." 15 U.S.C. § 1055. A related company, pursuant to 15 U.S.C. § 1127, is defined as "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services[.]" A parent-subsidiary relationship clearly falls within the related company provision. 3 McCarthy, *supra*, § 19:51; *The May Dep't Stores Co. v. Prince*, 1978 WL 21571, at *4 (T.T.A.B 1978). Furthermore, the Lanham Act does not require the licensee or related company to appropriate the mark as the company name. *See, e.g.*, *Cobra Capital LLC v. LaSalle Bank Corp.*, 455 F. Supp. 2d 815, 819 (N.D. Ill. 2006).

Here, ANICO's subsidiaries fulfilled brokerage and advisory functions for the retail mutual funds they sold and used the "American National" mark in various ways while doing so. Although SM&R did not use the American National mark in its company name, the mark was openly and notoriously displayed via its advertising, promotion, and in rendering various services, including dispensing investment advice and brokering mutual funds. Moreover, there is no evidence in the record that ANICO retained less than total control of the mark's use with regard to these products and services. ANIA is correct to point out that many of SM&R's materials – prospectuses, advertising, and business cards, for example – also identified SM&R as the managing and underwriting entity. But this does not nullify the products' clear association with "American National," and the mere fact that a particular product or service may be

associated with one brand does not preclude its association with another.[6]  Accordingly, ANICO's evidence establishes that these agents sufficiently "used or displayed the mark in the sale or advertising of services" as required by 15 U.S.C. § 1127, and ANIA's *bona fide* use argument fails.

ANIA also contends that ANICO has neglected to police its marks through legislation. This assertion, while potentially relevant to assess the strength of a mark or a loss of distinctiveness, is but one factor of many and not dispositive of abandonment. 3 McCarthy, *supra*, § 17:17. To the contrary, ANICO's continued operation of related businesses under the mark, its recently-formed subsidiary ANRIA, and its recent trademark applications, rebut any suggestion of the requisite intent not to resume use. *See Sands*, 978 F.2d at 955; *Roulo*, 886 F.2d at 938. For these reasons the Court rejects ANIA's affirmative defense of abandonment.[7]

### b.    Fraud

ANIA next asserts fraud as an affirmative defense to ANICO's infringement claims regarding Reg. '021. Fraud upon the USPTO in trademark registration may be asserted in a variety of procedural contexts, including as an affirmative defense to an infringement action. *See* 6 McCarthy, *supra*, § 31:59; 15 U.S.C. § 1115(b)(1). A finding of fraud in trademark registration is appropriate "only if the applicant or registrant knowingly makes a false, material representation with the intent to deceive the PTO." *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009). Allegations of fraud "should not be taken lightly," and while "indirect and circumstantial evidence" is allowed, all evidence must still be "clear and convincing" in order to

---

[6]      In fact, in a slightly different context, the Seventh Circuit has noted that concurrent use of other brands does not diminish the impact of using the target mark. *See, e.g., Ty, Inc.*, 237 F.3d at 299; *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1088 (7th Cir. 1988).

[7]      ANIA's assertion that its use of the mark predates ANICO's new subsidiary has no bearing on the evidence of intent to keep using the mark.

satisfy the burden of proof. *Id.*; *see also Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008); *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 670 (7th Cir. 1982).

ANIA argues that ANICO made fraudulent misrepresentations to the USPTO by falsely claiming that it had used the mark "American National" in the context of mutual fund investment services. ANIA's argument hinges upon ANICO's statement to the USPTO that it was using the '021 mark "in commerce" as defined by 15 U.S.C. § 1127. Section 1127 requires the party asserting this defense to establish that the statements to the USPTO were materially false and made with deceptive intent. *In re Bose*, 580 F.3d at 1245-46.

First, ANIA has provided little or no evidence that ANICO's representations to the USPTO were materially false. In light of the Court's conclusions above as to non-abandonment and *bona fide* use, the Court finds that ANICO did not misrepresent the facts to the USPTO when it asserted that it was using the mark in commerce.

Second, ANIA fails to demonstrate with clear and convincing evidence that ANICO acted with the intent to deceive. There is "a material legal distinction between a 'false' representation and a 'fraudulent' one, the latter involving an intent to deceive." *Id.* at 1243 (citation omitted). ANIA's argument that Welch "should have known" that ANICO did not offer any branded mutual fund investment services in commerce to the public is insufficient to prove fraud. *Id.* at 13. Equating the "should have known" standard with subjective intent "erroneously lower[s] the fraud standard to a simple negligence standard." *In re Bose*, 580 F.3d at 1244. Even a gross negligence standard does not allow inference of an intent to deceive. *Id.* Here, the affiants

testified that they did not intend to deceive the USPTO, and after weighing the evidence presented at trial, including the testimony and demeanor of the witnesses, the Court agrees.[8]

ANIA also seeks to establish that Boulware knowingly perpetuated a fraud on the USPTO in the course of preparing and submitting the registration for the "American National" mark. The "clear and convincing" standard for deceptive intent applies equally to counsel's actions as it does to parties; and, even in cases involving allegations of materially false representations, "honest misunderstanding or inadvertence" by counsel does not establish fraud without evidence of willful intent. *Id.* at 1246; *see also M.C.I. Foods, Inc. v. Brady Bunte*, 96 U.S.P.Q.2d 1544 (T.T.A.B. 2010). Here, ANIA suggests that, as the person who drafted the affidavits and managed the registration process, Boulware had the requisite intent to deceive. Dkt. 108, *supra*, at 20. ANIA further suggests that because Boulware did not testify at trial, all possible inferences regarding her behavior throughout the registration process should be drawn against her client. *Id.*

ANIA's attempts to place Boulware at the center of the dispute are not new. ANIA tried to depose Boulware during discovery, but Magistrate Judge Denlow precluded it from doing so. Citing *Shelton v. Am. Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986), the Magistrate Judge held that ANIA had failed to demonstrate that it could not obtain the information it sought in discovery from a source other than Boulware, an attorney whose communications with ANICO triggered the attorney-client privilege. Based upon this order, ANICO filed a motion *in limine* to preclude ANIA from calling Boulware to testify during the trial. The Court granted ANICO's motion, holding that ANIA again had failed to demonstrate that the information it sought from

---

[8]     ANIA even concedes that "[i]n this sense [of a wrongful intent] the witness-affiants Clay and McCroskey didn't think they did anything wrong, and maybe they didn't." Dkt. 108 (Def.'s Post-Trial Br.) at 16.

Boulware was not available from another witness. Indeed, ANIA had ample opportunity to depose and cross-examine the affiants themselves and did so. For this reason, the Court rejects ANIA's request for an adverse inference against ANICO based upon Boulware's failure to testify at the trial.[9]

For all of the foregoing reasons, the Court finds that there is insufficient evidence to support ANIA's affirmative defenses of abandonment and fraud. Therefore, the Court holds that ANICO's '021 mark is protected under the Lanham Act along with its other undisputed marks.

## 2. Likelihood of Confusion

Having demonstrated the protectibility of its marks under the Lanham Act, ANICO must establish that ANIA's use of its marks "is likely to cause confusion among consumers" to prevail on its Lanham Act claims. *Segal*, 517 F.3d at 506.

Likelihood of confusion in a trademark case is determined by a seven-factor test: (1) similarity of the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) evidence of actual confusion; and (7) any intent by the defendant to "palm off" its product as that of another. *See AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008); *CAE, Inc.*, 267 F.3d at 678; *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 643 (7th Cir. 2001); *Ty, Inc.*, 237 F.3d at 897; *Eli Lilly*, 233 F.3d at 461-62. The "likelihood of confusion test is an equitable balancing test." *Barbecue Marx*, 235 F.3d at 1044. "No single factor is dispositive and courts may assign varying weights to each of the factors depending on the facts presented."

---

[9]     The cases cited by ANIA in support of its contention that Boulware's failure to testify at trial supports an adverse inference against ANICO are inapposite. These cases involve a plaintiff invoking his Fifth Amendment rights against self-incrimination in a civil action, and do not stand for the principle that plaintiff's counsel's decision not to offer testimony will result in an adverse inference being drawn against her client. *See, e.g., Harris v. City of Chi.*, 266 F.3d 750, 753 (7th Cir. 2001); *Daniels v. Pipefitters' Ass'n Local Union No. 597*, 983 F.2d 800, 802 (7th Cir. 1993) (drawing inference against civil plaintiff invoking Fifth Amendment privilege not to testify permissible but not required).

*CAE, Inc.*, 267 F.3d 660 at 678. That said, the similarity of marks, the existence of actual confusion, and the defendant's intent are particularly important in determining likelihood of confusion. *Id.*

As an initial matter, the USPTO's rejection of ANIA's federal trademark application on likelihood of confusion grounds is not dispositive of this issue. This is because determinations by the USPTO examiners or the TTAB do "not necessarily equate to a determination of 'likelihood of confusion' for purposes of trademark infringement." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 716 F.3d 1020, 1025 (8th Cir. 2013); *see also Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 734 (2d Cir. 1991). The Court therefore examines each factor of the balancing test in light of the evidence presented at trial.

### a.        Similarity of the Marks in Appearance and Suggestion

Because likelihood of confusion is an equitable balancing test, the "weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other." *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1187 (7th Cir. 1989). The Seventh Circuit has found the similarity of the marks at issue to be one of three especially important factors. *See AutoZone, Inc.*, 543 F.3d at 929; *CAE, Inc.*, 267 F.3d at 678; *Packman*, 267 F.3d at 643.

The federal registrations presented to the Court primarily consist of standard character marks. The focus of the parties with respect to this issue, the '021 mark, is simply the word mark "American National."  This mark is identical to the mark in ANIA's abandoned application. In use, both parties represent themselves by using variations of "American National," sometimes with descriptors, and sometimes by those two words alone. Other than generic descriptors such

as "Investment Advisors," the registered marks of the two parties are identical. With identical marks, the risk of confusion is high.

The logo and design aspects of the senior and junior marks are not covered by Reg. '021, but still hold relevance for unfair competition and common law infringement claims. In design, the marks begin to differentiate themselves. ANICO's logo is a monochrome, simple text depiction of the words "American National" below the figure of an eagle. ANIA's colored logo depicts a stylized flag over the words "American National," and additionally includes the rest of the company name in smaller text below. Despite the differences in font and graphics, however, it is clear that the words "American National" are far and away the most prominent feature of the logos. The words are centrally placed and serve as the logos' primary identification. Indeed, "'if one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements.'" *Ty, Inc.*, 237 F.3d at 898 (quoting *Henri's Food Prods. Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 356 (7th Cir. 1983)). Differences in design do not diminish the fact that the predominant identifying features for both parties' marks are the identical words "American National." As such, the similarity of the marks favors ANICO.

### b.      Similarity of the Products

Confusingly similar products need not be directly competitive. *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990); *see also McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1169 (7th Cir. 1986). The rights of a trademark owner "extend to any goods or services that, in the minds of consumers, might be put out by a single producer." *AutoZone, Inc.*, 543 F.3d at 931. The "inquiry in comparing the two products is not whether they are interchangeable, but whether 'the parties' products are the kind the public might very well

attribute to a single source (the plaintiff).'" *Eli Lilly*, 233 F.3d at 463 (quoting *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1089 (7th Cir. 1988)).

Here, the services that the parties offer to the public are materially identical. ANICO has presented substantial evidence during the trial that it offers financial planning and investment services to customers, including services related to mutual fund investments, both directly and through its subsidiaries SM&R and later ANRIA. In comparison, ANIA also offers financial planning and investment advice, including retirement planning, education planning, and investment management. In fact, ANIA's own expert, Dr. Thomas Maronick, agreed that both parties are in the same area of trade. Dkt. 107, Tr. at 394:3-7.

Based upon the record, the Court finds significant similarities and areas of overlap between the parties' respective products and services. Accordingly, this factor weighs in favor of ANICO.[10]

### c. Area and Manner of Concurrent Use

Analysis of the area and manner of concurrent use can involve several factors, including: relative geographical distribution; evidence of direct competition; sales through the same marketing channels; and the manner of use and channels of commerce in which the mark is used. *Ty, Inc.*, 237 F.3d 891 at 900; *CAE, Inc.*, 267 F.3d at 681. For geographical distribution, it is proper to compare relative area, not total scope, because "trademark law makes no exception for the localized infringer." *AutoZone, Inc.*, 543 F.3d at 932.

---

[10] Besides products currently offered by the parties, reasonable potential expansion by the mark holder into a junior user's products and services also supports a finding of similarity. The likelihood that "consumers might reasonably expect [plaintiff] to expand its business to offer the same products and services offered by [defendant]" favors increased likelihood of confusion. *CAE, Inc.*, 267 F.3d at 678. Again, the key test is whether members of the consuming public would be likely to attribute goods and services offered by the defendant to the plaintiff instead. *Id.* Here, ANICO has an extensive history of providing certain types of financial services, and its recent ventures demonstrate a continued commitment to investment and financial consulting that is more general in scope.

Based upon the evidence at trial, the area of use between ANICO and ANIA appears to be roughly comparable. ANICO maintains at least eleven agents in the Chicagoland area, while ANIA runs a small office located in the same general geographic area. Dkt. 92 (Stipulations) at 12; Dkt. 104 (Pl.'s Post-Trial FF) at 7. While no evidence of direct competition was presented, both marks are used in the same manner. "American National" is the primary identifying component of each company's name on all company materials. This name is featured on each party's website and promotional materials, and both names are commonly shortened to identical monikers. Moreover, both parties target a nationwide audience via their online presence, although ANIA's clientele is smaller in number and more locally based.

ANICO, as a much larger company, spends a significantly larger quantity of resources on marketing. Between 2006 and 2010, ANICO allocated $32 million to promotion and marketing, including magazine, internet, and newspaper advertising (although there is some testimony to suggest that ANICO does not place great emphasis on public advertising). Dkt. 105, Tr. at 44:16-21; Dkt. 107, Tr. at 300:18-24 (stating that ANICO "in general does not do any public advertising"). ANIA, by contrast, does no significant advertising beyond presentation of its website. ANICO retains about five million policyholders nationwide, while ANIA manages approximately 500 accounts, mostly in the Chicagoland area. Most of ANIA's clientele comes from Claeys' existing contacts, or referrals from the same. Dkt. 107, Tr. at 312:11-20.

Despite these differences in scope and marketing budgets, the parties' principal use of their respective marks is comparable. Both parties use the marks to identify themselves as providers of financial services. The primary difference is that ANICO, as a manufacturer of insurance and financial products, is able to brand funds and other investment products with its name in addition to providing branded investment advisory services. Within the scope of those

services, however, usage of the marks is highly similar. Another similarity is the fact that both parties target many of the same consumers: investors who will purchase securities such as retail mutual funds or related products. ANIA's website also notes that Claeys is registered to sell insurance products, although he has testified that he does not do so in practice. *Id.* at 318:24-25.

These facts leave open the possibility of consumer confusion within the same geographical area and same customer base. On balance, the Court finds that the geographical overlap and similar usage weigh in favor of ANICO, if only slightly so.

### d.    Degree of Care Likely to be Exercised by Consumer

Generally speaking, "the more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." *CAE, Inc.*, 267 F.3d at 683. That said, a consumer's "technical sophistication about [its] particular industry does not necessarily equate to trademark sophistication." *Id.* An analysis of this factor will include considerations such as the sophistication of the likely purchaser and the expense of the product. *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 805 F. Supp. 2d 503, 517 (N.D. Ill. 2011); *see also Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir. 1997).

With investment portfolios ranging from the tens of thousands to millions of dollars, one might expect that potential clients seeking the types of products offered by ANICO and ANIA would demonstrate a higher degree of care in choosing investment advisory services. Interestingly, ANICO's expert witness Timothy C. Pfeifer argues to the contrary, opining that consumers are *less* careful with financial services than with other products (perhaps due to limitations in their own knowledge coupled with high confidence in their advisors), and that the types of investors targeted by both parties are not necessarily financially savvy. Dkt. 106, Tr. at

246:7-21. ANIA counters that consumers such as its clients, who have an average individual investment of more than $100,000, are likely to be careful and thoughtful in their decisions. Dkt. 108 (Def.'s Proposed Conclusions of Law) at 4.

The Court notes that neither party has presented statistical data to support its position. Nevertheless, on balance, the Court finds the testimony of ANIA's expert more persuasive, particularly in light of the substantial financial commitments that are at stake. The investing public may lack sophistication to do the actual investing, but, as noted, sophistication in the field does not correspond to sophistication in trademarks. The Court finds it likely that customers will exercise greater care when choosing where to invest their money. *See Unity Health Plans Ins. Corp. v. Iowa Health Sys.*, No. 13-cv-845-wmc, 2014 WL 460866, at **11-13 (W.D. Wis. Feb. 5, 2014) (finding an elevated degree of care for costly health insurance plans); *Flagstar Bank, FSB v. Freestar Bank, N.A.*, 687 F. Supp. 2d 811, 831 (C.D. Ill. 2009) (describing a higher degree of care for complicated and intrusive banking transactions). Thus, the fourth factor weighs slightly in favor of ANIA.

### e.  Strength of the ANICO's Mark

Strength of a mark "'refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular . . . source.'" *Eli Lilly*, 233 F.3d at 464 (quoting *Sands*, 978 F.2d at 959). By another measure, the "legal strength of a mark is usually the same as its economic and marketing strength." *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004) (internal citations omitted).

Examined independently, the terms composing the mark "American National" are not particularly strong in and of themselves. Along these lines, ANIA argues that the words are "merely descriptive" of ANICO's scope. Dkt. 108 (Def.'s Proposed Conclusions of Law) at 5.

To ANIA's point, "it is common within the financial industry for companies to share portions of their names," rendering similarities in name perhaps less remarkable. This phenomenon is particularly prevalent in the retail banking industry. *See* David H. Herrington & Arminda B. Bepko, *Trademark Battles in the Banking Field: When a Bank Acquisition Gives Rise to a Trademark Dispute*, 126 Banking L.J. 450, 451 (2009) (citing *First Keystone Fed. Sav. Bank v. First Keystone Mortg., Inc.*, 923 F. Supp. 693, 704 (E.D. Pa. 1996)). Nevertheless, while bank names may not be "given as wide a berth as trademarks in other fields of business," neither party is a bank, and ANIA does not provide any facts to suggest that investment advice companies should be treated as such. *Id.* For example, the record is devoid of evidence that the words "American National," due to their desirable connotations, appear "so frequently as to be almost ubiquitous" in the financial investment sector, as is often the case in banking disputes involving words such as "commerce" or "citizens."[11] *Id.*

ANIA does note that the parties apparently came up with the same name independently and attempts to bolster its argument by demonstrating that there are a large number of other companies named "American National." Dkt. 107, Tr. at 319:14-320:4, 383:12-20. However, ANIA fails to present any evidence as to the strength of these other purported American National marks. "[T]hird parties' trademark registrations are material to the strength of mark 'only to the extent that the similar marks are promoted by their owners or recognized by the consuming public.'" *CAE, Inc.*, 267 F.3d 685 (quoting *McGraw-Edison*, 787 F.2d at 1171); *see also AutoZone, Inc.*, 543 F.3d at 933. Nor has ANIA presented evidence to show that other American National marks have weakened the public's recognition of ANICO's mark. Absent a showing of near-ubiquity and the corresponding weakening of the phrase "American National," the Court

---

[11]     ANIA does not argue that "American National" has achieved near-ubiquity because of the desirable connotations, but rather that the mark is merely descriptive.

finds the unremarkable nature of the compositional words to have limited bearing on the likelihood of confusion analysis.

Indeed, ANICO is a large entity, with approximately $22 billion in assets and more than five million policyholders. Dkt. 92 (Stipulations) at 12. The marks themselves have been in use by ANICO for about 100 years, and for over 40 years with respect to mutual fund investment services. *Id.* at 12-13. Such popularity and length of use demonstrate a relatively strong mark. *See Barbecue Marx*, 235 F.3d at 1045. In fact, the company has promoted this mark by making significant expenditures on advertising and has received recognition from both ratings agencies and popular media.[12] Pl.'s Exhs. 202-04, 206, 214-225, 331-32. Admittedly, ANICO's mark's strength as an investment advisory brand may not comport with its overall marketing strength. Working in ANICO's favor, though, is its consistent "American National" branding across all its goods and services.

For these reasons, the Court finds ANICO's "American National" mark to be moderately strong. Thus, this factor also favors ANICO.

### f.      Existence of Actual Confusion

The sixth factor is another that takes on heightened importance. *Bobak Sausage*, 805 F. Supp. 2d at 515. A well-established method for demonstrating actual confusion (or lack thereof) in trademark infringement cases is the consumer survey. However, survey evidence "in trademark cases must comply with the principles of professional survey research. . . ." *Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 776 (7th Cir. 2007). In assessing the trustworthiness of survey evidence, the Court should consider whether:

---

[12]      For example, ANICO has received a moderate/strong rating of "A" from Standard and Poor's, and recognition as one of Forbes' "100 Most Trustworthy Companies."

(1) the "universe" was properly defined; (2) a representative sample of that universe was selected; (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner; (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted; (5) the data gathered was accurately reported; (6) the data was analyzed in accordance with accepted statistical principles; and (7) objectivity of the entire process was assured.

*Weight Watchers Int'l, Inc. v. The Stouffer Corp.*, 744 F. Supp. 1259, 1272 (S.D.N.Y. 1990); *see also Muha v. Encore Receivable Mgmt., Inc.*, 558 F.3d 623, 625 (7th Cir. 2009).

To support it position on actual confusion, ANICO offered the expert testimony of Timothy Pfeifer, an actuarial consultant, as to the likelihood of confusion regarding the "American National" marks as they appear in the names American National Insurance Company and American National Investment Advisors. Dkt. 106, Tr. at 232:12-16. Based upon his knowledge of ANICO's business and his review of ANIA's website and Cleay's deposition, Pfeifer testified that, in his professional opinion, the typical consumer would not be able to differentiate between ANICO and ANIA due to the overlap in their services. *See, e.g., id.* at 244:21- 245:14 (discussing confusion due to overlap in services); 248:12-21 (noting that some ANICO-affiliated agents may offer ETFs, or exchange traded funds, stocks, or bonds, like registered investment advisors). As a result, Pfeifer opined that there existed a "possibility of likelihood of confusion" by a typical consumer as between ANICO and ANIA. *Id.* at 253:10-15. The Court finds this testimony persuasive and affords it substantial weight.

For its part, ANIA relied upon an October 2012 customer survey conducted by its expert, Thomas Maronick. The survey included a thousand respondents and was targeted to internet users, who (1) had agreed to participate in such surveys for monetary compensation and (2) had existing financial investments. Dkt. 107, Tr. at 385:22-386:7, 388:3-389:4. According to

Maronick, the survey drew respondents from a "worldwide panel" consisting of a geographically indiscriminate sample of internet users. *Id.* at 382:6-14.

Maronick's survey presented each respondent with 3 webpages: one from ANICO's site, one from ANIA's site, and one from a separate "control" site (samples "A", "B", and "C"). *Id*. at 386:8-14. The presentation order was rotated for different respondents. *Id.* The respondents were asked to view the sample webpages and note whether they believed that any of the three companies were associated or affiliated with each other. The responses were analyzed and placed into various groups: those that believed A and B were affiliated; those that believed A and C were affiliated; those that believed B and C were affiliated; those that believed all three companies were affiliated; those that believed none were affiliated; and those that responded "unsure." Def.'s Exh. 25. Based upon the data, Maronick opined that the level of likely consumer confusion between ANICO and ANIA was between 2.5% and 4.2%. Dkt. 107, Tr. at 389:11-391:20.

ANICO raises two objections to the soundness of Maronick's conclusions. First, ANICO questions whether the survey accurately replicated the relevant universe and market conditions. *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 396 (7th Cir. 1992); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 953 (N.D. Ill. 2009). ANICO's rebuttal expert, Gabriel M. Gelb, testified that Maronick should have limited the survey to the geographical area around Chicago where ANIA retains customers. Gelb also argues that the survey should have "replicated market conditions" by more closely targeting the survey to potential consumers of ANIA's investment products, in addition to those who already had existing investments. Dkt. 107, Tr. at 441:9-443:19. ANICO argues that these failures to properly define the universe of the survey and

replicate market conditions reduce the survey's probative value to almost nil. Dkt. 104 (Pl.'s Proposed Conclusions of Law) at 31.

The Court is not convinced that the survey's geographic scope significantly reduces its probative value. Survey evidence, after all, need not be perfect to be admissible. *See, e.g.*, *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship*, 34 F.3d 410, 416 (7th Cir. 1994). Even if Chicagoans are much less (or much more) savvy when making financial investments than residents of other areas, the Court finds nothing in the record to suggest that the survey's geographic universe skewed it in favor of either party. Similarly, the Court finds that Maronick's screening questions, which narrowed the survey's universe to existing financial investors and did not include those seeking to initiate investments, were not so limiting as to create an improper demographic pool. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993) (A survey "so flawed as to be completely unhelpful to the trier of fact" is rare).

ANICO's second criticism that Maronick's survey utilized an improper control is more troubling. In any methodologically sound study, a control is intended to minimize the effect of variables other than the variable at issue. For instance, in a survey of trademark consumer confusion between two restaurants, a large proportion of respondents might confuse two restaurants with similar names. A smaller percentage of the sample population, however, might confuse *any* two restaurants regardless of name. This baseline level of consumer confusion, or "noise," should be excluded when analyzing the level of confusion caused by the similar names. 3 McCarthy, *supra*, § 32:187.

A control should "share[] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." Shari

Diamond, *Reference Guide on Survey Research*, Reference Manual on Scientific Evidence 399 (3d ed. 2011). Take, for example, a case involving forward confusion by a junior user involving two similarly-branded restaurants. A persuasive survey would employ a control restaurant that is almost identical to the junior user's restaurant, except for the characteristic "whose influence is being assessed," which in this case is the name. *Id.* This ensures that any confusion that a consumer might have between the two restaurants at issue is caused by the junior use of the mark, and not by extraneous factors, such as the type of cuisine served by the restaurant. As Maronick agreed, "a control is a survey element used to filter out other causes of confusion or association where a respondent's confusion or association might be based on features that are not in dispute." Dkt. 107, Tr. at 415: 9 – 20.

Despite this, Maronick selected "American National Bank" as the control for his study. But this control shares the very characteristic whose influence is being assessed – the mark "American National." Accordingly, the control does nothing to eliminate background noise from the survey and undermines the survey's probative value. For example, it could be that the survey respondents confused American National Insurance Company, American National Investment Advisors, and American National Bank based upon the financial products and services they offered or the look and feel of their respective websites, as opposed to their names. Alternatively, perhaps the respondents believed the companies were affiliated solely because of their names, regardless (or perhaps in spite of) their respective products and services. A properly selected control would have isolated the cause of the confusion; the control selected by Maronick did not.[13]

---

[13] An alternative control would be a registered investment advisor, similar in scope, operation, and presentation to ANIA, and with a comparable but different name – "U.S. Countrywide Investment Advisors," for example. *See*, *e.g.*, *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp. 2d 266, 280-81 (S.D.N.Y. 2006).

The reason that Maronick did not employ the type of control espoused in the Diamond article is plain. Rather than studying whether ANIA's use of the "American National" mark *in and of itself* resulted in consumer confusion, the self-described purpose of Maronick's survey was to determine whether consumers would confuse the two companies based upon all of the information contained on their websites (which, of course, included the names of the companies, as well as other factors that are not the subject of this dispute). Dkt. 107, Tr. at 413:25-414:24. In so doing, the survey did little to address the central issue in dispute in this case, that is, whether ANIA's use of the mark "American National" is likely to cause consumer confusion. As such, the Court affords Maronick's conclusions little weight.

> Q: [To Maronick] So you were *not* testing the characteristic American National. Instead, what you were comparing was American National Insurance Company with American National Investment Advisors.
>
> A: That is correct. . . .

Dkt. 107, Tr. at 415: 3-8 (emphasis added).

What is more, to the extent that Defendant's survey has any probative value, it appears to support the proposition that there is a substantial likelihood of confusion as to the two companies. Of the individuals surveyed, thirty-six percent believed that all three entities – American National Insurance Company, American National Investment Advisors, and American National Bank – were affiliated, and of these individuals, approximately forty-four percent stated that this belief was due to the similarity in the names. Def.'s Exh. 25 at 7, 9.[14] Furthermore,

---

[14] Of course, it stands to reason that if a particular respondent believed that A, B, and C were all affiliated, that individual would necessarily believe that A and B were affiliated with one another.

based upon Maronick's own data, an *additional* eight percent of the respondents believed that ANIA and ANICO were affiliated.[15]

After considering all of the evidence offered by the parties at trial, the Court finds that there is a substantial likelihood of confusion between the two marks, and this factor tips in ANICO's favor.

**g.    Intent to Palm Off the Product**

The last of the three most prominent factors is the junior user's intent to palm off. Palming off, or a party's intentional presentation of its goods or services as those of another, is strongly determinative of infringement and often provides grounds for awarding treble damages under the Lanham Act. Extensive advertising and marketing may support a finding of intent to palm off. *See AutoZone, Inc.*, 543 F.3d at 933-34. Also, "[a]n intent to confuse may be reasonably inferred from the similarity of the marks where the senior mark has attained great notoriety." *Id.* at 931 (citation omitted). Here, neither prerequisite is present. ANIA claims to have been unaware of ANICO's existence until receiving the cease-and-desist letter on April 19, 2011. ANICO does not seriously dispute this assertion, nor does it claim such extensive advertising or such a great level of notoriety as to imply intent. Furthermore, nothing on the record suggests any intent by ANIA to purposely portray its business as originating with ANICO. This factor, to the extent applicable, thus weighs in favor of ANIA.

**h.    ANICO's Remaining Registrations**

ANICO asserted four additional trademark registrations in its Proposed Findings of Fact: No. 1,207,500; No. 1,207,499; No. 1,308,303; and No. 3,217,075.  However, ANICO's post-trial

---

[15]       ANIA makes the further argument that, once the control is factored into the analysis, of this eight percent, only between 2.5% to 4.2% of respondents attributed their confusion to the names of the companies. But, as discussed above, the reliability of this conclusion is highly suspect given the inadequacy of the control.

briefs focus almost exclusively on the Lanham Act claims and the '021 mark, which is consistent with ANICO's approach during the trial.

After reviewing the evidence presented at trial, the Court finds that ANICO has failed to prove by a preponderance of the evidence that a likelihood of confusion exists with respect to these other registered marks. For example, there is no evidence that ANIA underwrites life and health insurance (Reg. '499 and Reg. '500) or provides underwriting services for property and casualty insurance (Reg. '303). In fact, Claeys testified that ANIA does not sell insurance, and Pfeifer admitted that a typical customer looking for insurance, who walks into ANIA's office and does not see "American National Insurance Company," might not confuse ANIA with ANICO. *See* Dkt. 106, Tr. at 256:4-9. Nor has ANICO proved by the preponderance of the evidence that customers are likely to confuse ANIA with the mark "American National Design Benefits: The Financial Building System" (Reg. '075). Accordingly, the Court finds that ANICO has failed to meet its burden of proof to establish likelihood of confusion with respect to the marks other than the '021 mark, and enters judgment in favor of ANIA in this respect.

### i.     Conclusion

After considering the foregoing evidence, the Court finds that ANICO has satisfied its burden of demonstrating that "AMERICAN NATIONAL," Reg. '021, is a valid and protected trademark, and that ANIA's unauthorized use of the mark resulted in a likelihood of consumer confusion. Accordingly, the Court will enter judgment in favor of ANICO pursuant to 15 U.S.C. § 1114(1)(a) and 15 U.S.C. § 1125(a)(1) with respect to Registration No. 1,837,021. For the reasons previously discussed, the Court finds that ANICO has failed to meet its burden of proof with respect to the other trademarks and enters judgment in favor of ANIA as to those trademarks.

## B. State Common Law Trademark Infringement Claim

The Lanham Act was passed in 1946 as an attempt "to 'federalize' existing common law protection of trademarks used in interstate commerce." *CAE, Inc.*, 267 F.3d at 672 (citation omitted). It follows that an Illinois common law claim for trademark infringement uses the "same analysis" as a federal Lanham Act claim. *Trans Union LLC v. Credit Research, Inc.*, 142 F. Supp. 2d 1029, 1038 (N.D. Ill. 2001); *see also AHP*, 1 F.3d at 615. Common law and Lanham Act claims of trademark infringement for the same marks are thus resolved concurrently. *See, e.g.*, *Flagstar Bank*, 687 F. Supp. 2d at 822; *Trans Union LLC*, 142 F. Supp. 2d at 1044; *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*, 80 F. Supp. 2d 815, 826 (N.D. Ill. 1999); *see also* 3 McCarthy, *supra*, § 23:1:50.[16]

In light of the findings as set forth above, the Court finds that ANICO has met its burden of establishing trademark infringement under Illinois common law and enters judgment in favor of ANICO with respect to Count III as to the mark "American National." For the reasons previously discussed, the Court finds that ANICO has failed to meet its burden of proof with respect to the other trademarks and enters judgment in favor of ANIA as to those trademarks.

## C. State Statutory & Common Law Unfair Competition Claims

The Illinois Consumer Fraud and Deceptive Business Practices Act imposes liability on any person who employs "[u]nfair methods of competition and unfair or deceptive acts or practices, including [. . .] the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act.'" 815 Ill. Comp. Stat. 505/2. The Illinois Uniform Deceptive Trade Practices Act ("UDTPA") defines a person engaging in deceptive trade

---

[16] Of course, a common law claim for trademark infringement does not require a federal registration. *See, e.g.*, *Dwyer Instruments, Inc. v. Sensocon, Inc.*, 873 F. Supp. 2d 1015, 1037 (N.D. Ind. 2012) (permitting a common law infringement claim for a product line that was not federally registered as a mark); *see also* 3 McCarthy, *supra*, § 19:8.

practices as someone who "(1) passes off goods or services as those of another; (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods; (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another." 815 Ill. Comp. Stat. 510/2(a).

In cases where the factual allegations forming the basis for Lanham Act claims and UDTPA claims are the same, "the legal inquiry is the same under both statutes. Claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act." *SB Designs v. Reebok Int'l, Ltd.*, 338 F. Supp. 2d 904, 914 (N.D. Ill. 2004) (citing *Gimix, Inc. v. JS & A Grp., Inc.*, 699 F.2d 901, 908 (7th Cir. 1983); *see also McGraw-Edison*, 787 F.2d at 1173. Furthermore, a "common law unfair competition claim need not be separately addressed since it is codified by the Deceptive Trade Practices Act." *MJ & Partners Restaurant Ltd. P'ship v. Zadikoff*, 10 F. Supp. 2d 922, 929 (N.D. Ill. 1998) (citing *Mars, Inc. v. Curtiss Candy Co.*, 290 N.E.2d 701, 704 (Ill. App. Ct. 1972)).

In light of the findings as set forth above, the Court finds that ANICO has met its burden of establishing its claims for statutory and common law unfair competition and deceptive business practices as asserted in Count IV of the Complaint and enters judgment in favor of ANICO pursuant to 815 Ill. Comp. Stat. 505/1-12 and 815 Ill. Comp. Stat. 510/1-7 with respect to the "American National" mark. For the reasons previously discussed, the Court finds that ANICO has failed to meet its burden of proof with respect to the other trademarks and enters judgment in favor of ANIA as to those trademarks.

## D.    Attorneys' Fees

ANICO contends that, as the prevailing party in this trademark action, it is entitled to reasonable attorneys' fees associated with pursuing this action.[17] *See* 15 U.S.C. § 1117(a). ANIA, not to be outdone, claims that it is entitled to attorneys' fees in the event that it prevails in this action.  As set forth above, the Court found in ANICO's favor as to the primary mark at issue in this case, Reg. '021, but not as to the other marks at issue. The Court therefore must determine whether ANICO constitutes a "prevailing party" for the purposes of awarding attorneys' fees.

"[P]arties are said to have prevailed in litigation for 'attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'"  *King v. Ill. State Bd. of Elections*, 410 F.3d 404, 414 (7th Cir. 2005) (internal citations and quotations omitted).  Moreover, "'to be considered a prevailing party . . . [a party] must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant.'"  *Id.* (quoting *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989)).  Because Reg. '021 was the focal point of this litigation, ANICO prevailed in its infringement claim against ANIA in relation to that mark, and the effect of the litigation will be to enjoin ANIA from infringing upon the mark, the Court concludes that ANICO is the "prevailing party" for attorneys' fees purposes.[18]

That alone, however, does not entitle ANICO to attorneys' fees. As ANICO itself recognizes, it is only appropriate to award attorneys' fees in trademark cases to prevailing parties in "exceptional" cases. *See Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 626

---

[17]    Although ANICO's complaint originally sought treble damages pursuant to 15 U.S.C. § 1117, its post-trial submissions do not seek monetary damages other than attorneys' fees.

[18]    Because ANIA is not the prevailing party in this action, the Court denies its request for attorneys' fees asserted in its post-trial brief.

F.3d 958, 963-64 (7th Cir. 2010) (Posner, J.). In this Circuit, the paramount example of an "exceptional case" warranting attorneys' fees involves a losing party who is a "defendant [who] had no defense yet persisted in the trademark infringement or false advertising for which he was being sued, in order to impose costs on his opponent." *Id.* at 964. However, the U.S. Supreme Court in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, --- U.S. ---, 134 S. Ct. 1749, 1756-57 (2014) recently elaborated on the definition of "exceptional case" in awarding attorneys' fees in intellectual property cases. There, the Supreme Court abrogated the Federal Circuit case of *Brooks Furniture Mfg., Inc. v. Dutallier Int'l, Inc.*, 393 F.3d 1378 (Fed. Cir. 2005), holding that the "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." The Supreme Court further noted that such a determination should be made on a case-by-case basis, considering the totality of the circumstances. *Id.* 134 S. Ct. at 1756-57.[19] Thus, attorneys' fees could, in some circumstances, be appropriate even where the party's conduct was not necessarily independently sanctionable or in bad faith. *Id.*

Here, after considering the totality of the circumstances, the Court finds no basis for concluding that this is the type of case that warrants an award of attorneys' fees. Although this case was hard-fought, there is no evidence that ANIA proceeded in bad faith or that its arguments were frivolous. Even though the Court ultimately concluded that ANIA's affirmative defenses did not carry the day, its fraud and abandonment defenses did survive ANICO's motion

---

[19]     In doing so, the Supreme Court cited to *Fogerty v. Fantasy, Inc.,* 510 U.S. 517 (1994), where the Court "explained that in determining whether to award fees under a similar provision in the Copyright Act, district courts could consider a 'nonexclusive' list of 'factors,' including 'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* 134 S. Ct. at 1756 n.6 (citing *Fogerty*, 510 U.S. at 534, n. 19).

for summary judgment. Given the procedural history of this action, the Court cannot conclude that ANIA acted frivolously or in bad faith or that its positions were objectively unreasonable. Therefore, ANICO's request for attorneys' fees is denied.

### E. Permanent Injunction

The primary form of relief ANICO asks the Court to impose is injunctive. Federal courts have the power to award injunctive relief in trademark cases pursuant to 15 U.S.C. § 1116. *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 217 (1985). In trademark infringement cases, the typical four-factor injunctive relief analysis is not strictly necessary because a "showing of a likelihood of confusion alone will suffice to support a grant of injunctive relief." *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 206 (7th Cir. 1982) (internal citation omitted). However, principles of equity should still be considered in fashioning an appropriate remedy. 15 U.S.C. § 1116(a).

Here, the Court has found that ANICO has established a likelihood of confusion on the merits as to Reg. '021, rendering injunctive relief appropriate. ANICO asks the Court to enter a permanent injunction as follows:

- to enjoin ANIA and its officers, agents, and employees from using the combination of the words "AMERICAN" and "NATIONAL" or any other words that would be likely confused with ANICO in ANIA's trade name, advertising, web domain name, website, or any other mode of communicating with the public;

- to require ANIA to advise ANICO of the name it will use in the future and obtain ANICO's approval prior to implementing the change;

- to require ANIA to provide a certification of destruction of any existing materials using the AMERICAN NATIONAL name;

- to require ANIA of any instances it discovers of actual confusion with ANICO's Mark; and

- for the Court to make a determination of priority of use as the senior users for the Mark in the financial services and products field in order to nullify ANIA's contentions in the USPTO to the contrary.

Dkt. 103 (Pl.'s Post-Trial Br.) at 22-23. ANIA fails to set forth any objections to the scope of this injunction in its post-trial submissions, arguing only that injunctive relief is generally inappropriate. Therefore, having determined that ANICO is entitled to injunctive relief, the Court will enter a permanent injunction against ANIA as requested by ANICO.

## VI.    Conclusion

For the reasons stated, the Court enters judgment in favor of Plaintiff American National Insurance Company with respect to Counts I through IV of the Complaint with respect to the "American National" mark as set forth in Registration No. 1,837,021.  Because ANICO has not met its burden of proof with respect to the other registered trademarks, judgment is entered in favor of ANIA with respect to those trademarks. The Court further will enter a permanent injunction against Defendant American National Investment Advisors, LLC.  Plaintiff American National Insurance Company is directed to tender to the Court a proposed order setting forth its proposed injunctive relief within ten (10) days of this Order.[20]

SO ORDERED                                ENTERED

                                          _John Z. Lee_

                                          John Z. Lee
                                          United States District Judge

Dated:  November 21, 2014

---

[20]    In light of this ruling, Plaintiff's motion to strike appendices [Dkt. 110] is denied as moot.